RECEIVED CLERK

APR 05 2019

U.S. DISTRICT COURT

FILED
U.S. DISTRICT COURT

2019 APR -8  ⊃ 1: 57

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

Brian K. Jackson (15296)
Brian K. Jackson, LLC
341 S. Main St. Suite 500
Salt Lake City, Utah 84111
Phone: (801) 441-8922
Fax: (801) 534-1948
brianj@bjacksonlaw.com
Attorney for Donna Wright

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| Donna Wright;<br>    Plaintiff,<br><br>v.<br><br>Rio Tinto America, INC;<br>Sedgwick Claims Management Services Inc,.<br>    Defendants, | **COMPLAINT**<br><br>Civil No.:<br><br>***JURY TRIAL REQUESTED*** |

Plaintiff, Donna Wright now brings this action by and through her attorney of record,

Brian K. Jackson of Brian K. Jackson, LLC. in the United States District Court for the District of

Utah, Central Division and hereby allege and complain the following facts and requests this

court that compensation for damages that she incurred based on the foregoing legal causes of

actions against Rio Tinto, America, INC and Sedgwick Claims Management Services Inc.:

## PARTIES, JURISDICTION, VENUE

1.    Donna Wright was an employee of Rio Tinto America, INC at their West Jordan, Utah

location as a wheel-haul truck driver and sought worker's compensation benefits with her

Case: 2:19−cv−00234
Assigned To : Furse, Evelyn J.
Assign. Date : 4/5/2019
Description: Wright v. Rio Tinto
America et al

insurance carrier, Sedgwick Claims Management Services, Inc. She is a resident of Paonia,

Colorado, with the intent to stay there.

2.    Rio Tinto America, INC was the employer of Ms. Wright and is a global corporation that

focuses is industry in mining raw material and has a mine in West Jordan, Utah, under the name

of Kennecott Copper mine of which they employed Ms. Wright to drive their haul-truck mining

trucks whose primary and employs over 2,000 employees. Its registered agent is located at 15

West South Temple STE 1701 Salt Lake City, UT 84101.

3.    Sedgwick Claims Management Services, Inc. and or New Hampshire Insurance Company

was the insurance carrier for Rio Tinto America, INC that handled the worker's compensation

claim benefits for Donna Wright as it pertained to her left shoulder injury to the re-injury of her

right shoulder whose principal headquarters are located in Memphis Tennessee and has a

registered agent within the state of Utah located 1108 E South Union Ave. Midvale, UT 84047.

4.    Personal jurisdiction is proper as both defendants have an active presence within the state of

Utah and benefits from the laws and protection of the laws within the state of Utah as it relates to

employment, workers compensation benefits, mining benefits among other benefits being within

the state of Utah. Both companies have an active presence and are registered within the state of

Utah. Given that both companies deal with Utah employees and their worker's compensation

benefits, both entities would have anticipated that liability or claims would have arisen out of their

actions within this state.

5.    Subject matter jurisdiction and venue is proper as this matter and the incidents occurred

within Salt Lake County, Utah and from a contract arising out of Salt Lake County. This action is

also bought pursuant to the claims under the Americans with Disabilities Act of 1990 and its

amendments as well as under the Employee Retirement Income Security Act of 1974 as a result, are claims arising under federal law. Ms. Wright also filed a complaint with the Utah Labor Division and sought a right to sue given the lapse in time of 180 without a completed investigation and brings this matter within that 90-day time-frame. All other state claims are supplemented and properly raised in this court as a result of the federal claims. All parties are also diverse state citizens or entities with a claim that is more than $75,000. The state claims described herein are also intentional claims and fall outside any claim under the exclusive remedy doctrine as it relates to Worker's Compensation.

## GENERAL ALLEGATIONS

*Supporting factual detail as it relates to the legal claims below are **found in the supplemental factual** section of which Ms. Wright incorporated into this complaint and alleges the specific factual allegations of her claims into each cause of action below.*

## LEGAL CLAIMS

## INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS

127.     Rio Tinto intentionally interfered with economic relations and the profession of Ms. Wright, her worker's compensation benefits, her 401k benefits, her private medical benefits, her short-term disability insurance, with the purpose to interfere with those relationships in that the company refused to allow Ms. Wright to continue necessary physical therapy when she returned to work.

129.     The company through their employees acting in the course and scope of their employment as supervisors for Ms. Wright refused to put Ms. Wright on more qualified trucks at her request which affected her economic relation benefit with the company as to her health and

well-being as a worker which was substantially certain to cause additional injury to her shoulders given her health condition at that time and already suffering from complications from her shoulders. The course and scope of which was with the intent at least in part to benefit the company through their supervisory skills or acted with apparent authority that they had the ability to supervise Ms. Wright and determine what trucks she had to drive in. The actions were intentional or in reckless disregard as the supervisors knew Ms. Wright had already returned from a shoulder injury due to lifting heavy wheel chocks prior and that she was suffering from complications to both her shoulders at that time and it was substantially certain that Ms. Wright given her age, height and weight would suffer another injury and not be able to work.

130.    The company forced Ms. Wright to use trucks with a 50 lb. wheel chalk on a bent rod despite the knowledge of her restrictions and her prior injury on her right shoulder from lifting a wheel chalk the result of which caused additional injury to Ms. Wright on both shoulders that affected her economic relationship with the company and her ability to work full-time the actions of which were done by improper means in that Ms. Wright should not have been lifting a 50 lb. wheel chalk in light of her height, weight, age and prior injury and ongoing complications with her shoulder and should not have been lifting the chalk on a bent rod which caused her to have to lift the chalk higher than normal at at times above her head depending on where the rod was.

131.    That the company started to write Ms. Wright up for missing work as a result of going to the doctor, and for running over an electric cable as a result of her sickness and the placing of the electric cable, making it unsafe for Ms. Wright to maneuver around the cable which was substantially certain that such write-ups would affect Ms. Wright and her profession with the company which was by improper means as Ms. Wright needed medical attention and time-off

work to attend to her injuries and incentivized Ms. Wright not to seek treatment for her injuries and forced her to keep working with her injury and after her injury to her left shoulder in fear of termination.

132.    They were also done by improper means as the electric cable was a safety hazard caused by the company and Ms. Wright was disciplined for the company causing a safety hazard to her that could have seriously injured her. They were also done by improper means as it relates to discrimination and harassment as described in the discrimination section of this complaint and failure to accommodate Ms. Wright and her injuries. The actions of which caused additional pain and damage to both Ms. Wright's left and right shoulder, stress, anxiety and other damages described in this complaint.

133.    The company failed to report the work-site injury when she reported it to her supervisors and contacted Human Resources. The company interrogated and bullied Ms. Wright at a Union meeting in October of 2016 with Union Rep. Frank Lucero and claimed that it wasn't a worksite injury when they met with the union. The company failed to report the work-site injury within the specific time-frame to claim she was did not report the injury in time, despite telling her supervisors and Human Resources of the worksite injury and the company admitting that her FMLA was denied because she had filed a worker's compensation claim. The purpose of which was to find a means to claim that Ms. Wright was not entitled to workers compensation benefits. The purpose of which was also to claim that the company had a right to their work-free accident injuries.

a. The purpose of which was also to deter individuals to make worker compensation claims and have them do it on their private insurance. If Ms. Wright had not filed a work-site injury, she

could be recovered from her injury by now or be closer to recovery than she is right now. The company also hired an "expert" witness that was not qualified as an expert to testify as to the timing of Ms. Wright's injury to claim that since she reported the work-site injury in a timely manner, that it wasn't a work-site injury. The claim of which had no medical basis. Also, Ms. Wright had reported a work-site injury. The failure to report was on part of the company. Not her own. If the work-site injury had been reported in a timely manner, she could have had surgery the same year she was injured instead, she had to wait over a year for her surgery.

134.    The company when they initially reported the injury claimed that the injury happened back in 2015 at a different location, which led to an initial denial of her claim. That the company failed to allow Ms. Wright to take money out of her 401k when she requested such given her financial condition, and ultimately forced her to be evicted from her home.

135.    That the company through its employees in their course and scope of employment intentionally cancelled Ms. Wright's medical benefits in January of 2018 as it related to medical benefits. Only an employee clothed with authority or apparent authority could have advised, interfered with or been in charge of Ms. Wright's benefits. The company knew or should have known they could not terminate her benefits under company policy as Ms. Wright was on leave for workers compensation. The company also knew or should have known that she was set for surgery that very month after the many delays the company had caused prior.

136.    That the company did not approve or turn in her short-term disability paperwork until 10 months after she had applied, after she had already been evicted from her home and had to move to Colorado. The approval of should have occurred within days of when Ms. Wright

applied. Ms. Wright also talked directly to Human Resources regarding her short-term disability

paperwork in person to ensure that they had the paperwork.

138.    The actions created interference where it was substantially certain that such

interference was certainly to occur as a result of their actions as to Ms. Wright's worker's

compensation benefits, medical benefits, and short-term disability benefits, given the write-ups to

Ms. Wright for missing work because of her medical condition, the actions of failing to report the

injury led to her inability to properly bill private insurance and obtain surgery for her injury, it led

to the initial denial of her worker's compensation claim and the ultimate denial of her claim, it led

to the denial of her benefits and delay of her benefits and it led to additional emotional distress

and physical pain to her injury and prolonging her ability to return to work and making the injury

and stress so severe that she may now not be able to return to work.

139.    The actions were also done by improper means as the company had a duty to report the

work-site injury to the Labor Division, when she told her supervisor, her supervisors at the union

meeting and when she called Human Resource several times. It was also done with an improper

means, to deter Ms. Wright from filing a worker's compensation claim. It was also done

improperly as the company had a duty not to allow CDL drivers with an impairment to drive until

they obtained proper federal medical clearance. The purpose of which was also improperly tied to

the bonus incentives for a work injury free site. The purpose was also improper as the accident

was not reported until the following calendar year as to not affect the bonuses for that year.

140.    The actions of which made it so Ms. Wright suffered an additional injury to her right

shoulder when her left shoulder was injured, the actions of which also ultimately and rendered her

disabled. These were also substantially certain to occur given the failure to report an injury,

forcing her to continue to work on a known injury and delaying her ability to obtain surgery.

141.    The actions of which were intentional as noted above and in light of the company's

policy toward work-place injuries and worker's compensation claims, knowing that Ms. Wright

had reported an injury, that she had requested for worker's compensation, that she had requested

time-off for her surgery, that she had requested money out of her 401k, knowing that she was

taking time-off work for her injuries and that she was sick or in reckless disregard with the

substantial probability that such actions would interfere with Ms. Wright and her economic

relations. *Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d 293 (Utah 1982)

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

142.    The actions described in intentional interference of economic relations and

discrimination were also actions that were intended to inflict emotional distress on Ms. Wright on

in reckless disregard that such actions would be substantially certain to inflict emotional distress

on her.

143.    Rio Tinto through its employee, Cal Russ, that wanted Ms. Wright to have a

relationship with her intended to inflict emotional distress on Ms. Wright when the employee

retaliated against Ms. Wright when she refused to have a relationship with her including

complaints against Ms. Wright and her work performance and harassment over the company radio

while she worked. The actions were within the course and scope of his employment as an

employee that had the ability to file a complaint against other employees with the intent at least in

part to benefit the company for complaints against other employees and was authorized to make

such complaints on the company's behalf. The actions were intentional as Ms. Wright had

communicated to him that he did not want a relationship with her and were retaliatory against her for her refusal. The actions of which are extreme and outrageous in a civilized community and outside the bounds of decency given the regulations surrounding workplace harassment, sexual harassment as well as criminal violations of harassment and sexual harassment of unwanted sexual advances. The actions of which caused and were meant to cause emotional distress to Ms. Wright including stress and anxiety within the workplace.

144.     The company through its supervisors intended to inflict emotional distress on Ms. Wright when they did not address, rectify or discipline the employee that was sexually harassed Ms. Wright and allowed the workplace environment and hostility to continue after she had informed them of the situation and showed them unwanted sexual advances. The actions of failing to rectify the situation, investigate and discipline the individual are outside the bounds of decency within a civilized community given the regulations regarding workplace harassment, the policies that surround unlawful workplace harassment and the entitled of individuals to be free from a harrasive workplace environment from sexual advances and retaliation. The actions of which were meant to inflict emotional distress on Ms. Wright with their failure to rectify the situation given her report to the company and concerns and distress she had already suffered of which her supervisors were aware. Or their actions were in reckless disregard, in that failure to rectify the situation would cause a substantial likelihood that it would cause additional emotional distress to Ms. Wright for failure to rectify the situation.

145.     The company through its employees, intended to inflict emotional distress on Ms. Wright with the individuals that worked the shovels and slammed them into Ms. Wright while use the haul-truck. The actions of which the individuals did intentionally as a joke to "shake-up" the

haul truck drivers including Ms. Wright. These actions occurred at least six times and as a result, Ms. Wright has a claim for each time it happened. One incident of which was observed by another employee which was so severe that he filed a complaint with the company against the individual. The actions of which are beyond the bounds of decency in a civilized community given the mass of the shovel and the haul-truck and the potential for bodily injury it can cause including death. The actions of which almost caused Ms. Wright to potentially fall through the windshield if she had not had her seat-belt on and the action of which caused pain to her neck.

146.     The company, through Ms. Wright's supervisors and Human Resources intended to inflict emotional distress on Ms. Wright when they denied her time-off to attend physical therapy when she returned from work. The company through those individuals, knew that Ms. Wright was still recovering from her injury and required additional physical therapy.

a. The company also knew that Ms. Wright was on leave prior for Worker's Compensation and that her FMLA time should not have been allotted for her time-off and should have been reimbursed to her. The denial of her FMLA when she returned was either done intentionally, knowing that she was on time-off for worker's compensation, or in reckless disregard in failure to recognize she was out on worker's compensation leave.

b. The actions of which had a substantial likelihood would cause additional distress to Ms. Wright in that they made it so she limited options for time-off she needed to properly obtain medical attention to her recovering shoulder. The actions re outside the bounds of decency of a civilized community given that Ms. Wright was out on Worker's Compensation leave and as a result was lawfully entitled to FMLA time at that time. The actions of which were outside the bounds of decency in light of the fact the company knew that Ms. Wright needed physical therapy still in her

recovery process on her right shoulder and she had just returned from leave as it related to her right shoulder. The actions of which are discriminatory as well based on a disability and a failure to accommodate as explained above.

147.    In connection to the count above, the company, through its supervisors, had the intent to cause emotional distress on Ms. Wright when they started to discipline her for missing work as a result of her shoulder injury in 2016. The company knew that Ms. Wright had missed work for her injury to attend the doctor she was still suffering from complications with her shoulders. The were to inflict emotional distress on her for attending the doctor, knowing that she would suffer from such distress as it related to her job security as well as her ability to proper attend to her medical complications. The actions of which were outside the bounds of decency in a civilized community as noted in the count above as to accommodating individuals with known disabilities and the unlawful activity of discipling individuals based on a known disability and knowing she was still in the recovery process.

148.    The company through its supervisors, intended to cause emotional distress on Ms. Wright when they placed her on lessor-qualified trucks than other trucks that individuals used. Ms. Wright complained to her supervisors of which no remedy was made. The actions made it so it was harder for Ms. Wright to keep track of her personal belongings and to ensure that her truck was clean and the actions of which the company knew was causing distress to the company when Ms. Wright apprised them of the conditions. The actions caused Ms. Wright, who had just suffered from a shoulder injury prior from lifting a wheel chalk, to suffer another injury to her left shoulder and re-injure her right shoulder. The company failed to put Ms. Wright in a situation where did not have to lift the heavy wheel chalks when she returned in light of her weight

restrictions. The situation of which caused Ms. Wright to suffer from additional and unnecessary fatigue to her shoulders as well as stress and anxiety related to the pain of which the company knew would occur or had the substantial likelihood of occurring in light of her known injuries and recovery. This includes failing to rectify a safety issue with the 409 truck that had a bent rod that caused Ms. Wright to have to lift a heavy 45 lb. wheel chalk above her head on her recovering shoulder and fatigued shoulders. The failure of which also had the substantial likelihood of causing distress to Ms. Wright in light of her height, weight, age and prior injury. The actions of which are outside the bounds of decency in a civilized community, given the known injury of Ms. Wright, her age, height and weight and the failure to accommodate her shoulder and her complaints of her continuing to being moved around.

149.     The company, through its supervisors and Human Resources, intended to cause emotional distress on Ms. Wright when they failed to report her injury through the company, to the insurance company and to the Labor Commission in a timely manner of which she suffered in July of 2016. Ms. Wright notified her supervisor after she went to the doctor and learned that her doctor thought her shoulder was torn instead of sprained. She also talked to him about it in September. The situation was so severe, that her supervisor took her off the truck she was assigned to that caused her injury.

150.     The situation of which was also so severe that he sent Ms. Wright to the company doctor. The company in October of 2016 disputed with Ms. Wright on whether or not it was a work injury instead of reporting the work injury when she had a union meeting. The company failed to file a work injury after Ms. Wright maintained that it was a work injury. The company failed to file a work injury after she had called and left messages to Human Resources reporting

the work injury. The company failed to file a work injury after Ms. Wright's doctors requested her

time-off for her work-injury in October through Doctor Curtis, in November through Ms. Maas,

and in December through both of those doctors and with her therapist. They failed to file a work

injury when she contacted them in January regarding the situation.

a. The work injury was never filed by the company. It was instead filed by her doctor and by the

insurance company and when Ms. Wright called the Labor Commission. The actions the company

knew or knew that their actions had a substantial likelihood would cause emotional distress on

Ms. Wright given that she could not bill her private insurance since she claimed for it to be a

worksite injury and she needed a claim filed prior to her insurance accepting the claim.

b. The company also knew of the need for Ms. Wright to have her upcoming surgery which

should have occurred in October, November, December and didn't occur until over a year later as

a result of their failure to properly file a work-site injury. The actions were also done at least in

part due to the inventive not to report work-site injuries with bonuses for a work-free site. The

actions of which were outside the bounds of decency in a civilized community, given the

company's duty to report work-site injuries to their insurance carriers and knowing that Ms.

Wright had claimed to have suffered a work-site injury.

151.     The company caused emotional distress to Ms. Wright through Human Resources and

her supervisors acting within the course and scope of their employment authorized to act on

behalf of the company when they improperly processed her FMLA work in November, December

of 2016 and January of 2017. Her supervisors' withheld the paperwork and did not turn it in to

Human Resources. Human Resources claimed they did not have any paperwork. The company of

which knew or should have known that Ms. Wright through her doctor in October, November and

December and requested time off work and knew of her upcoming surgery. The company instead of which marked Ms. Wright AWOL and told her she had to come back to work in December.

a. The company of which then denied her FMLA paperwork in December of 2016 claiming they did not have all the paperwork of which thereafter, they claimed they had after Ms. Wright spoke to Ms. Newman and told her she had handed it to her supervisor. The actions of which they knew or would have substantially known that their actions would have caused emotional distress to Ms. Wright in light of her attempts to get time-off work before getting terminated to have her surgery and the actions of which along with the failure to report the work-site injury kept her from having her surgery. The company of which did not approve of her FMLA paperwork until September of 2017. The actions of which are outside the bounds of decency of a civilized community as it comes to handling individuals request for time-off work related to a personal injury.

152.      The company caused and intended to cause emotional distress to Ms. Wright or knew that their actions had the substantial likelihood of causing emotional distress to Ms. Wright through Human Resources on how they handled her short-term disability paperwork. The company knew that Ms. Wright had an upcoming surgery and she was supposed to have it the month prior. The company knew that Ms. Wright was facing eviction from her home. The company knew it was to the point where she might have to sell her truck. Ms. Wright told this personally to Human Resources when she handed them the paperwork and knew that any delay would likely cause her emotional distress. They caused her emotional when they did not sign their portion of the paperwork until four months after she had handed in the paperwork to send to met-life. The actions of which caused emotional distress to Ms. Wright as she was not given her short-term disability in a timely manner. The action of which caused her to be evicted from her

home and render her homeless and force her to move to Colorado. The actions of which caused emotional distress as explained in the factual section above. The actions of which are outside the bounds of decency in a civilized community in that Human Resources and their duties is to properly process and file short-term disability paperwork in a timely manner.

153.     The company through Human Resources, intended to cause emotional distress to Ms. Wright or with the substantial likelihood that their actions would cause emotional distress when they refused to allow her to take out money from her 401k for a financial hardship in light of her inability to cover for rent due to her inability to work in the December of 2016 and knowing about her financial condition and health condition and need for surgery. The failure to allow her to take from her 401k were outside the bounds of decency in a civilized community given the financial hardship she was in and her right to take from her 401k even it took a tax hit. The actions of which caused emotional distress to Ms. Wright as explained in the count above and in the factual section.

154.     The actions of which are outside the bounds of decency of a civilized community in that a company would report a work-place injury, a company would file the proper paperwork for worker's compensation in a reasonable time-frame at the time the injury is reported.

155.     That a company would make repairs to dangerous rigs that could cause injury to its employees.

156.     That the company would not force Ms. Wright to continue to work with a heavy wheel chalk after returning from her initial injury.

157.     A company would allow their employee to take money from their 401k in light of the circumstances.

158.    A company would properly administer and approve of short-term disability and its paperwork.

159.    A company would not force Ms. Wright to continue to work in light of her left shoulder injury without federal medical clearance prior in light of the knowledge of her injury and the pain she was suffering from and the pain medication she was prescribed and was unable to take such pain medication while she was working.

160.    That a company would not intentionally cancel an employee's medical benefits.

161.    The actions of which caused unnecessary emotional distress on Ms. Wright the distress of which is described in the factual section of this complaint.

162.    The actions of which were intentional or substantially certain to inflict emotional distress on Ms. Wright, given the write-ups that affects her ability and performance as to her job, the work that she had to continue to do knowing that she had a prior injury and reported a new injury, knowing that they placed Ms. Wright on lessor qualified trucks with a 50 lb. wheel chalk on a bent rod, her need for pain medication and her inability to take it while she worked, the knowledge of the bonuses and the failure to report the injury to obtain a bonus, knowing that Ms. Wright would not obtain the proper medical assistance for her injury without the report and her inability to obtain surgery. Knowing that Ms. Wright was in need of financial assistance but not allowing her to obtain such assistance. Knowing that Ms. Wright was in need of short term disability but not properly filing the paperwork for her to be approved.

### ASSAULT AND BATTERY

156.    The company intentionally put Ms. Wright in reasonable apprehension of offensive harm or their actions had the substantial likelihood that it would cause harm to her and contact to

her right shoulder when she was denied her ability to continue to work with physical therapy or work with weight lifting restrictions knowing that she had just returned from a work injury and was still recovering knowing she had to work without such medical care and denied her FMLA leave. The action of which put her in reasonable apprehension of offensive harm to her recovering shoulder and harm to her left shoulder and caused harm to her left shoulder with the injury she suffered and the re-injury with her right shoulder and fatigue and issues she suffered with them prior.

157.      The company intentionally put Ms. Wright in reasonable apprehension of offensive harm or their actions created a substantial likelihood that it would but Ms .Wright in apprehension of offensive harm and contact when she was forced to work on trucks that were damaged with bent rods and lift heavy wheel chalks. This was after Ms. Wright notified the company about the quality of trucks she was put on that put her in apprehension of harm on her right shoulder with the lessor quality trucks and injured her left while lifting the wheel chalk and being forced to lift a 45 lb. wheel chalk on a bent rod. The company also knew that Ms. Wright still suffered from and was recovering from her prior right shoulder injury and they should have given her a lighter wheel chalk to accommodate her as well as her height and weight even if she had not had a prior injury. The action of which actually caused harm to Ms. Wright and to both of her right and left shoulders, tearing them. Forcing her to continue to work after her known injury also caused additional harm and contact to her known injuries and forcing her to work without pain management medication which was the only time she could be relieved of the pain. It also caused her to lose sleep and suffer from unnecessary and additional stress and anxiety and depression related to the injury. This includes violation of 30 CFR § 56.14205 in the use of the wheel chock

rod that was bent beyond the capacity intended by the manufacturer where such use may create a hazard to persons and created a hazard to Ms. Wright especially in light of her height, weight and prior surgery and the failure to inspect and repair their vehicles prior to use of its employees.

a. This is also in violation of 30 CFR § 56.14206 in failure to secure movable parts, with the failure to properly position the wheel chock in the proper manufactured position to ensure it was mechanically secured. The chock could not be properly secured were and not in a position for safe travel and mechanically secured when the rod was bent.

b. This is also in violation of 30 CFR 56.14100 for failure to inspect the equipment and repair a defect in the equipment as it related to the bent rod and the failure to fix the defect in a timely manner. The failure of which created a hazardous condition toward Ms. Wright which put her in reasonable apprehension of harm and actually harmed her with the failure to fix the defect and the machinery was not not prohibited from use until the defect was corrected as required.

159.    The company intentionally put Ms. Wright in reasonable apprehension of offensive harm when they intentionally failed to report the work-site injury knowing or with a substantial likelihood of certainty, that their actions would cause harmful contact to Ms. Wright with her inability to obtain her surgery through private insurance and cause her to suffer from additional and unnecessary pain from her inability to obtain surgery and properly recover.

160.    The company intentionally put Ms. Wright in reasonable apprehension of offensive harm and contact when they failed to remedy or rectify the complaint that she made to them regarding claims of sexual harassment and through the actions of the individual while acting within the course and scope of his employment after Ms .Wright refused to have a relationship with him. The failure of which caused Ms. Wright to continue to work with the individual and

suffer from unnecessary complaints and harassment through the company radio and fear and anxiety regarding his retaliatory intentions and intentions to want to have a relationship with her. The company of which knew or were substantially certain that their failure of which and the actions of the individual himself would put Ms. Wright in continued and reasonable apprehension of offensive harm.

162.      When she was told that she had to come back to work when she was told that her FMLA and time off work was denied for her surgery, knowing she had not had surgery yet which put her in apprehension of harm with the pain she was in and caused additional pain to her when she had to return to work.

163.      The actions made it so she was unable to obtain the necessary surgery and put her in apprehension of harm and pain without her surgery and put her in actual physical pain without the necessary surgery. She was unable to use her private insurance until a worker's compensation claim was filed to obtain the necessary surgery which prolonged her surgery and forced her to move out of state of switch doctors.

164.      When the company untimely filed a work-site injury, six months after the injury which presumably done as to not to affect the 2016 bonuses which put her in apprehension of harm in her inability to obtain the paperwork to resolve the issue and obtain surgery and put her in pain with her shoulders with her inability to work on those shoulders.

165.      That the actions of which also caused actual physical harm to Ms. Wright, in that she suffered an injury on her left shoulder on the damaged truck.

166.      She thereafter injured her right shoulder after compensating her other shoulder.

167.    She suffered additional pain with the inability to obtain pain medication and her inability to sleep as a result of the pain at night.

168.    She suffered additional and unnecessary pain to her left and right shoulder due to the unnecessary delay of her prolonged surgery as well as unnecessary emotional pain.

169.    She suffered additional damages to both shoulders as a result of the unnecessary delay that ultimately rendered her disabled with concerns on the ability of her shoulders to ever be the same again.

170.    That the actions were intentional as noted in intentional infliction of emotional distress and intentional interference with economic relations.

### DISCRIMINATION BASED ON DISABILITY, AGE AND GENDER

170.    In that Ms. Wright suffered from a long-term disability that lasted longer than six months in her right and left shoulder injuries and substantially limited and affected her ability to work full-time without pain, lift the wheel chalk, sleep at night and other activities that related to high stress on her shoulders. Rio Tinto, which employed Ms. Wright was on notice of the disability to her right shoulder when she took off work for worker's compensation and when she reported the left shoulder injury to her supervisor on or about July of 2016. She was also regarded as having a disability through the determination of the disability social security administration.

171.    **Ms. Wright requested reasonable accommodations** to both of her injuries, namely, time off work for physical therapy and doctor visits for her right shoulder and her weight restrictions, working on trucks that were more qualified and did not requiring the use of a heavy wheel chalk or a bent rod as well as her ability to keep her things in her truck to help her with her

health. The company was also required for Ms. Wright to obtain federal medical clearance as a CDL before she returned back to work from an impaired limb after her left shoulder injury.

172.     She requested time-off work for her to have physical therapy, reported the work-site injury to the insurance company and to the Department of Labor. Short-term disability, and her ability to take money from her 401k.

173.     The requests of which the company failed to so as they did not honor the weight restrictions, they wrote Ms. Wright up and disciplined her for her doctor visits, they did not allow her to attend physical therapy, they did not allow her to work on safer, qualified trucks in light of her illnesses and injuries and forced her to work on a truck with a bend rod and a 50 lb. wheel chalk and to stay on the same truck. They did not timely report a work-site injury on her behalf. They did not timely file a short-term disability claim on her behalf. They did not allow her to take money out of her 401k. They did not seek to obtain federal medical clearance before Ms. Wright started driving again.

174.     When Ms. Wright was not allowed to go to physical therapy when she returned it resulted in additional damages and pain and suffering from Ms. Wright and additional injuries and loss of her work and a steady income and her ability to keep up with her bills. The physical pain of which Ms. Wright suffered became so intolerable, that she could not continue to work. The company of which threatened to terminate Ms. Wright for not continuing to come to work. The company of which also ultimately terminated Ms. Wright's medical benefits she had with the company. The company of which untimely paid Ms. Wright short-term disability.

175.     The requests of which were reasonable in light of the circumstances of did not require significant difficulty or expense on part of the company given their size, nature and financial

resources as a mining company within the state of Utah and the revenue they receive as explained in the factual section of the complaint and in light of the fact the company had trucks that would have been easier on Ms. Wright's shoulders they could have assigned her to, many individuals of which had assigned trucks. They could have allowed her to attend physical therapy and they were required to report work-site injuries and obtain federal medical clearance after a report of a limb impairment to a CDL driver. They also had a duty to properly file short-term disability claims and allow her to take money from her 401k in light of a financial hardship.

176.     **Ms. Wright was also harassed** and treated differently as a result of right shoulder injury when she returned to work. Before injury on her right shoulder, she had no issues with the company. When she returned from the company, she was treated lessor. She was belittled, mocked and harassed when her complaints went unheard when she complaint of the work conditions and in relation to her health. People unsubanstially were asking her for drugs as a joke as to her disability. She was written up for missing work to go to the doctor. She was written up for an accident that occurred as a result of fatigue she was suffering from with her shoulders and with a wire she was unable to navigate around and ultimately ran over and was in a unsafe location.

177.     She was harassed and scrutinized as to her work-place injury with claims from her supervisors that it actually didn't happen at work and the company ultimately did not file a work-site injury when she complained to supervisors and Human Resources. She reported it to one supervisor who never reported it. Thereafter, she had a meeting with them and the Union a month later and was further scrutinized as to the injury. It was still never reported. She reported the injury thereafter to Human Resources as least two times. The company waited until the following year to report the complaint, which can be reasonably inferred to ensure the work-site

injury would not affect bonuses and was inky filed until the following year as to not affect the 2016 bonuses. This was also after the company had claimed that her worker's compensation claim had already been denied in 2016 through Human Resources. This was after the company said that her request for time off work for her surgery in December had been denied and the company claimed that she had to return to work.

178.     She was harassed and scrutinized when the work injury claim was improperly filed correctly by the company when they finally did report it and was ultimately denied with claims that it was untimely and wasn't filed when she first reported the injury to her supervisors or to Human Resources.

179.     She was harassed and treated differently for suffering a work-site injury and reporting a work-site injury with the prolonged process she went through from reporting the injury. The company has a reputation and or policy that Ms. Wright knew where the company drags out actions of work-site injury claims which as a result, deters individuals from reporting work-site injuries and an attempt to save money, to persuade individuals to not report work-site injuries and go through their private insurance, to force individuals to settle claims that they should not settle when they are dragged out.

180.     But for Ms. Wright not reporting the work-site injury, she could be working with the company at this time. The actions of which also left Ms. Wright homeless and destitute for years and her inability to provide for the basic necessities for herself.  The actions of which did not allow her to bill her private insurance for her surgery until the end of February of 2016 and which delayed her surgery causing her to move and switch doctors and the additional stress, anxiety and depression that occurred of her having to move to a different state and live with family.

181.     The actions were so pervasive and severe that it changed the terms and conditions of her employment as to her right to be free from work-place harassment as well as her ability to work full-time, her ability to seek time-off for her injury and workers compensation for her injury and properly obtain the medical attention she needs when the accident first occurs, it has kept her from returning to work and prolonged her ability to return to work and raises questions if she will ever be able to return to work.

182.     She was unlawfully harassed when the company refused to allow her to take money from her 401k as a result of her disability and her inability to work and made unjustified claims as to the reason and basis for denying her ability to take from her 401k.

183.     She was harassed when the company filed for short-term disability almost 6 months after she applied for it, after she had been evicted from her home.

184.     She was also harassed and discriminated against when the company terminated Ms. Wrights' private medical benefits the month she was to finally obtain surgery on her left shoulder.

185.     **The company retaliated against** Ms. Wright for suffering from a work-site injury when she returned to work with writing her up and treating her differently and mocking and ridiculing her as described in the factual section of the complaint and in the harassment section.

186.     In that she was retaliated against for reporting her left shoulder injury and was scrutinized, belittled and harassed by her supervisors after her right shoulder injury and her left shoulder injury. She was retaliated against when the work-site injury was not ultimately and timely filed and properly filed and also was an attempt to claim that the injury was not reported timely barring her inability to properly recover from the injury as described in the facts of the complaint.

187.    She was retaliated against when her short-term disability claim was not properly

processed and filed by the company and did not obtain benefits until months later after she had

been evicted from her home and needed surgery.

188.    The company did not allow her to take money from her 401k. The company wanted

her to return to work in December with threats of termination and denial of her FMLA paperwork

for time-off for her surgery.

189.    They failed to accommodate her to have time-off to have her surgery and also with not

timely filing the work-place injury, she was unable to obtain the necessary surgery in December

of 2016 and recovery thereafter.

190.    She was retaliated against for filing another claim on her right shoulder and the

company unreasonably denied her claim.

191.    She was also retaliated against when the company terminated her private medical

benefits days prior and the month she was obtain surgery for her left shoulder.

192.    **The company discriminated against her** as to her privileges of employment,

including her right to workers compensation, her right to have the company file a workplace

injury on her behalf within a reasonable time so she can use her private insurance in the interim

for her injury, her right to short-term disability, her right to attend physical therapy, her right to a

good-faith defense as to her worker's compensation claim, her right to obtain medical assistance

and recovery as to the work-site injury, her right to be free from a hazardous work-site area as it

related to the bent road on the haul-truck.

193.    Ms. Wright was limited and segregated when she returned from her right shoulder

injury as to how she was treated by her employer as described in the complaint as to the

write-ups, the different attitude toward her when she returned, the comments that were made toward her and her attempts to report and file a worker's compensation claim which adversely affected her opportunity to obtain workers compensation, medical assistance under her insurance, file a workers compensation claim, obtain compensation for her worker's compensation claim.

194.    Also, the incentive the company had as to bonuses as to a work-place environment, and the perceived financial burden Ms. Wright would have as a result of her injury, were contractual arrangements subjecting Ms. Wright to discrimination in that it incentivized the company not to report the work injury for 2016 and they did not report the work injury until 2017 as a result as to not affect the bonuses, which discriminated against Ms. Wright and her ability to recover and report a work-site injury and receive compensation for a work-site injury.

195. The delay of which made it so the insurance company unreasonably claimed that it was not a work-site injury and denied her claim. It was also an administrative procedure and effect that perpetuated work-site discrimination based on disability.

196.    The policy, standard, criteria to "drag-out" worker's compensation claims, scrutinize Ms. Wright for claiming she suffered a work-site injury before reporting it, delaying filing a work-site injury even if there is no good-faith defense, not allowing to take money from her 401k, not timely filing her short-term disability, was a means to and incentive to deter individuals from reporting work-site injuries was also an arrangement and relationship that subjected Ms. Wright to discrimination and was a denial of Ms. Wright as to her benefits to recovery from the work-site injury and had the effect of discrimination based on disability and perpetuated discrimination who are subject to common administrative control as to her supervisors and Human Resources. These actions were also an exclusion of denial of benefits as to a known disability.

197.    The scrutiny Ms. Wright had with her supervisors was also a unlawful qualification standard and employment test to attempt to screen out Ms. Wright as a result of her disability, unless Ms. Wright claimed that it was a not a work-site injury and to deter her from claiming that it was a work-site injury and or to harass, coerce, bully her into not filing a work-site injury claim. This was also administrative control that perpetuated discrimination.

198.    If Ms. Wright had not reported her work-site injury, she would have been able to timely have her surgery and recovery more quickly, the company denied her her benefits when she reported the injury. The fact that she was scrutinized for it being a work-site injury is discrimination based on a known disability.

199.    As a result of the discrimination, the actions caused Ms. Wright to suffer actual physical harm to her left shoulder and her right shoulder in reaggravating her injury and forcing her to continue to work without proper federal medical approval. It caused Ms. Wright to suffer from increased pain and anxiety and depression past and future as explained in the complaint. It caused consequential damages as explained in this complaint including the loss of her home.

200.    **Ms. Wright was also discriminated against based on her age** under the same claims. Given the age of Ms. Wright, she was a greater liability to the company with declined health at an older age. They treated Ms. Wright differently as to her age with the presumption that because she was old, her complaints about pain were not warranted.

201.    They also treated her differently as to her age because she suffered an injury at her age, the company was subject to a possible high liability given the undetermined time if and when she could recover as well as medicaid and medicare concerns the company did not want to deal with which is one of the basis as to why the company continued to pursue this matter in bad-faith, as

they wanted finality as to her injury claims and paying her a lump-sum so they would not have to continue to have her on their insurance for a indefinite period.

202.     The action of which is unjustified and undermines the purpose and intent of the worker's compensation system and leads individuals to take bad settlement offers as to their desperation given their disability and need for financial stability instead of obtain weekly checks until their recovery.

203.     **Ms. Wright was also discriminated against based on her gender,** in that the company treated her and her injuries differently than a male, with the perception that because Ms. Wright was a woman, her injuries and claims were not serious and warranted.

204.     Also, the treatment, write-ups from her supervisors as to how she was treated after she returned were actions done at least in part past on the fact that Ms. Wright was a female, including her supervisors comment to take her and spank her.

205.     She was sexually harassed by a co-worker who tried to have a relationship with, the actions of which were unwelcome and unwanted. The company of which failed to do anything to the individual when she first reported it. The individual of which retaliated against Ms. Wright after reporting it with the texts he sent her thereafter and with the complaints that were unjustified against her regarding her driving thereafter.

206.     She was also harassed over the company radio by other males that created an unwelcome and stressful environment including employees taking the radio home and speaking to her while she was working over the radio.

207.     Her complaints she had as to the quality of trucks and having her materials were also based on the fact that she was a female and she had suffered a work-site injury.

208.    The actions of which caused Ms. Wright emotional damages as described herein, consequential damages, physical pain as to her injury, additional damage to her physical injury, lost wages and benefits past and future, lost medical expenses past and future, consequential damages as noted in this complaint. The actions of which were also intentional, given the incentives not to report work-site injuries and the policies and procedures surrounding work-site injuries and deterring individuals from reporting work-site injuries. The actions of which put Ms. Wright and her health in immediate peril of which she has suffered peril as to the emotional trauma and living conditions she has been placed in as well as loss of enjoyment of life. She also seeks attorney fees as authorized under statute.

## VIOLATION OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 (AGAINST SEDGWICK)

209.    "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." *(Section 409  ø1109(a) of the ERISA ACT)*

**a.        Breach of Fiduciary duty**

*210.*    "A Fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a

like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; *Id at SEC. 404. Ø1104. This action is also proper in civil federal court pursuant to 502. Ø1132.*

211.     **Count 1:** The insurance adjuster for Ms. Wright's worksite injury failed to investigate her claim in a timely manner as to her worksite injury in July 2016 and failed to use the care, skill and prudence and diligence that a prudent man acting in the line capacity and familiar with such matters would use in the conduct.

212.     They deterred from and breached this standard of care, when they denied her claim without proper notice prior, without a proper investigation and review, without requesting for an extension of time and claiming they would review it more thoroughly after the initial denial without justification legally or procedurally that they would or intended to.

213.     The insurance company never contacted or followed-up with Ms. Wright as to her claims. They never spoke to her directly. They denied her claim within weeks of her injury claiming that it was not work-related without any factual support to the contrary as to why it was not work-related. They claimed that they denied the claim because it was not work-related, but were still investigating the case to see if it was work-related.

214.     The company under rules and regulations had 21 days to determine whether or not the incident occurred on the work site or not. The company claimed they wanted a records review. If they wanted a records review, that should have been weeks prior and prior to denying her claim.

215.     Also, they should have asked for an extension as to the 21 days with the Labor Division. Denying her claim and claiming they would review her claim thereafter was unjustified under the rules. It placed Ms. Wright in a level of uncertainty as to when, if ever, she would be

able to obtain compensation for her claims, if they ever did overturn that decision and was a method to bifurcate, unjustifiably, the 21 day rule set. It also made it so that Ms. Wright at that point, had to file a request for a hearing review with the Utah Labor Division as it was her only method of recourse to have her claim reviewed.

216.     The company thereafter, unjustifiably dragged out her worker's compensation claim, failed to negotiate her case despite any basis as to continuing the claim with a justifiable defense.

217.     If they were still investigating the case, the claim should have never been denied initially. The denial of her claim and claims thereafter that they were still investigation were unjustified, unreasonable and impossible.

218.     **Count 2:** The insurance adjustor was also the entity that filed a work-site injury claim for Ms. Wright for Rio Tinto. The duty and obligation of which was Rio Tinto's not the insurance adjustor. The insurance adjustor also failed to use the skill and care in filling out the claim in initially putting the wrong date of injury and putting the site of injury at Ms. Wright's address and claiming that the injuries were unknown and how it was done was unknown. The insurance adjustor also failed to use the skill and prudence to put the correct date that the company was contacted and when the insurance company was initially contacted. The failures of which caused the insurance company to deny the initial claim, claiming that it was not within the statute of limitations with their own misgivings. The insurance company thereafter, filled out another insurance form the following day, claiming that the date the company contacted the company and the insurance carrier first learned of the claim was at a later date. The insurance company also again failed to state the proper reason why or how Ms. Wright was injured. The insurance company also again filed to state the proper place where Ms. Wright was injured. The failures of

which caused Ms. Wright to reach out to the company due to the inaccuracies. The inaccuracies of which the company never rectified. The inaccuracies of which substantially caused the ultimate denial of her claim.

219.     **Count 3:** The insurance adjustor also denied Ms. Wright's right shoulder claim of which she was having complications under the same injury. Given that the injury was related to a prior worker's compensation injury, Ms. Wright should have started receiving compensation as to that shoulder injury as well. Instead, the company unjustifiably and unreasonably denied her claim without a basis to support, claiming that the injury was not work related and there is no good-faith defense to claim under the medical records that it was not work-related. This was again, without contacting Ms. Wright as to her work injuries.

220.     The denials of which delayed Ms. Wright's ability to obtain compensation for her injuries, and caused additional damages as noted in this complaint.

221.     **Count 4:** The company also hired an expert witness to examine Ms. Wright's left shoulder work injuries in March of 2017 by Anthony C. Theiler, MD that acted as an agent of Sedgwick CMS to determine the validity of Ms. Wright's claims. The determination of which occurred after the claim had already been denied. The determination of which occurred also after Ms. Wright had raised issues with the company as to the prior denial as noted above and whether or not the denial was in good faith and claiming that she had a claim against the company for their denial of her claim in bad-faith.

222.     The expert witness examined Ms. Wright's claims without proper medical releases made prior and without all of the medical documents. The expert witness only made the finding that Ms. Wright's claim was more likely than not a work-site injury, given the date that the

company actually filed a work-site injury claim was December 29th, 2016. The filing of which

was the responsibility of Rio Tinto and not Ms. Wright. The expert failed to answer all other

questions made as to work restrictions, as to treatment plans, as to surgical candidacy, as to

aggravated impact or current condition based on the claim that it was not a work-site injury.

223.      The expert had no skill, knowledge, basis, background, nor did the expert actually

investigate the matter in speaking to employees, supervisors, Ms. Wright, and her doctors. Her

doctors had noted in their notes that it was as a result of a work-site injury and the prior issues she

had with her left shoulder a year prior. The doctor did not make a medical determination on

whether or no the type of injury that Ms. Wright suffered could have been reasonably or rationally

related to lifting a heavy-wheel chalk.

224.      The injury of which, with her torn bicep and how Ms. Wright lifted the wheel chalk

with her biceps and the same type of injury she suffered on her right shoulder that was from the

same activity are reasonably related to activities as to the injury and there were no facts, activities,

programs that Ms. Wright participated where the company could claim stemmed from that

work-site injury to make a factual finding that it was not work related. There was in essence, no

actual bonafide evidence to claim that such an injury was not work-related with an alternative

theory as to how she hurt her shoulder.

225.      The actual purpose of the Independent Medical Examination was not to make an actual,

bona-fide good-faith inquiry as to her injuries. The actual purpose and intent of the examination,

was to have some kind of evidence to rebut Ms. Wright's prior accusations that the prior

determination was not made in good-faith. The only response of which they could come up with

was that the work-site injury was not filed in time as to deter liability for their past actions. As a

result, this also deterred from an ordinary person with the proper skill and prudence given the conflict of interest that existed at that time and the ulterior motive and the lack of qualification as an expert to make such a determination. The action of which was also discriminatory against Ms. Wright and her disability and retaliatory for her claims of bad-faith for denying the claim against her.

226.     Also, the company has dragged-out the claim as a result of the allegations that Ms. Wright made against the company as to bad-faith as a means to coerce her to take a smaller settlement than what she was entitled to from suffering from a work-site injury. It is also at least in part related to the company wanting to pay Ms. Wright a "lump sum" to limit any future liability claims and payments the company may owe to Ms. Wright. The reasoning of which is not in good-faith and is not a good-faith defense and not in the best interest of Ms. Wright and her claim. The reasoning of which is discriminatory against Ms. Wright and her injury.

**Right Shoulder**

227.     **Count 5:** There was no basis to claim Ms. Wright's right shoulder that she re-injured, the injury of which was the exact same as to her prior based on the evidence from Doctor Beim matched to the prior medical records that it was not as a result of a different injury. Ms. Wright suffered the same injury with the same tendons that she had suffered from prior and she was still suffering from complications from her right shoulder when she returned from her injury to work. She was still required to lift a wheel chalk. She also had to favor her right shoulder when her left shoulder was injured, her right shoulder of which never fully recovered. The company had no basis and came out with no basis, did not interview or speak to Ms. Wright regarding her right shoulder injury prior to the denial, the denial of which was not in good faith.

228.     As a result, there were also not facts that could have justifiably allowed the company to claim that her right shoulder injury was not related to a work-site injury and such a prudent individual in their skills, would have determined that Ms. Wright's shoulders both left and right as a result, were work-related and allowed her to recover and receive compensation for her work-site injury.

**Discrimination based on disability**

229.     The actions of which was also unlawful discrimination in segregating Ms. Wright to standards, criteria and testing and conclusions that were unjustified and unsubstantiated because Ms. Wright had suffered from a debilitating work-site injury as explained in the discrimination section and was considered disabled. This is also coupled with the fact that she had already suffered from another injury from her right shoulder, the company of which attempted to limit their duty and compensation owed to Ms. Wright because it was unknown on how long she would require financial assistance as to this injury.

**Fraud as to Breach of Fiduciary Duty**

229.     The insurance company committed fraud in claiming that the time the company was first reported was not until Jan 10th of 2017 and the date the insurance adjustor was contacted was on Jan 11th 2017. They also committed fraud in claiming how the accident occurred, where the accident occurred and when the accident occurred when they filled out the first form. The intent to commit fraud is shown through the second claim-from the filled-out that thereafter claims that the date of the first report was not until Jan. 12th and that the insurance company did not know until Jan. 13th. This also indicates that the other factual information was also intentionally fabricated. The company also never rectified the failures as to the inaccuracies when Ms. Wright

contacted them as to the inaccuracies. The actions of which were for Ms. Wright and the company and the labor commission to rely on their factual claims

230.     The denial of Ms. Wright's original claim without a justifiable basis claiming they wanted more time to examine the record, which they could not lawfully do was also a false statement made intentionally and an omission of the actual basis for the denial of her claim. If they denied Ms. Wright's claim, then they denied her claim without further action without any appeal rights for Ms. Wright, but to file a request for a review hearing with the Labor Commission. The denial was also made without a medical release and therefore, the company could not have all the facts before them to make a proper informed decision. If they did have medical documents, it was in violation of HIPPA as it relates to proper medical release of health information. The company did not have a proper release until Ms. Wright had to file a complaint with the Utah Labor Division months after. The company also never spoke to Ms. Wright directly about her shoulder injury and denied her claim before she could speak to them. They could deny her claim without knowing the account of Ms. Wright and her injuries.

231.     The Independent Medical Examiner's claim that Ms. Wright's injury was not a work-site injury was also a false statement in that the Medical Examiner was not qualified to make such a statement. The medical examiner did not have the facts before him or medical records. It was also false in that Ms. Wright was not the one that filed the work-site injury report, it was the company. The medical examiner also intentionally omitted material facts as to the actual injury that Ms. Wright suffered and her medical records which were needed to actually medically determine if it was a work-site injury.

232.     The basis of which was also only to deter liability for the claims Ms. Wright raised as to her original denial prior as to bad-faith and was only intended to come up with a basis that the denial was justified when it was originally denied of which Ms. Wright had to reasonably relied on and had no choice to reasonably rely on for the denial.

233.     The company also intentionally omitted material facts as to Ms. Wright's right shoulder claim, without communicating to Ms. Wright the reason for the denial. Both denials of which without explanation, were to make it appear as if the company had a justifiable basis as to deny the claims for Ms. Wright to reasonably rely on of which Ms. Wright had no choice to reasonably rely on the fact that they had some kind of basis to deny the claim. The actions of which were false as Ms. Wright's right shoulder injury stemmed from a work-site injury that had occurred prior and there was no justifiable basis to deny her right shoulder injury and were intentional as there was no justifiable factual basis to deny such a claim against Ms. Wright. The reason of which was biased and retaliatory as Ms. Wright already had a pending claim with the company and had already raised issues of bad faith against the company. Ms. Wright was also not contacted prior to the review of the claim as to her right shoulder to determine the factual basis for her denial, nor was there a medical records request prior to her denial.

234.     All the actions of which breached the duty owed toward Ms. Wright and damaged her as a result of the fraudulent and omitted communications toward her. The actions were also at least in reckless disregard for the fact that there was no justification or reason to deny Ms. Wright's claims given her prior right shoulder injury, given that the company filed the claim late, given there was no medical evidence to prove to the contrary that it wasn't a different injury that was not work-related, with a substantial likelihood that such claims were false and unjustified.

235.     She also seeks punitive damages for the intentional actions explained herein under breach of fiduciary duty for Ms. Wright's claims for unjustifiably denying her claims with the intent to deny Ms. Wright's claims, or that the actions were in reckless disregard with again, the unjustifiable basis for denying her claims and continuing to litigate the matter.

236.     The violations of which caused Ms. Wright to suffer from emotional distress as explained in this complaint, additional unnecessary harm to Ms. Wright and her injury physically as well as pain and suffering, lost wages and benefits, loss of enjoyment of life as well as consequential damages and she seeks attorney fees and costs as a result of raising this action as authorized by statute at this time as to the time the company became involved in this matter and for the intentional actions described herein.

## ABUSE OF PROCESS

**236a.** Abuse of process has two elements: "'First, an ulterior purpose; second, an act in the use of the process not proper in the regular prosecution of the proceedings.'" Id. (citation omitted); see also William Prosser, Law of Torts, § 121, at 857 ("The essential elements of abuse of process . . . have been stated to be: first, an ulterior purpose, and second, a wilful act in the use of the process not proper in the regular conduct of the proceeding." (footnote omitted)).

236b. As to the duties described in the breach of fiduciary duties sections, namely in properly assessing and reporting Ms. Wright's claims as to her worksite injury, both entities also abused process and as to Sedgwick, breached the fiduciary duty owed to Ms. Wright as a result of this abuse of process.

236c. Sedgwick had an ulterior purpose to deny Ms. Wright's claims when she initially raised issues of bad-faith to the company for the initial denial of her claim and abuse of process without

properly offering an extension to review the claim. Sedgwick never had the intention to review the claim after the claim denial. The never had the intention to speak directly to Ms. Wright directly before they denied her claim. Sedgwick did not have a basis for the claim denial. Sedgwick drafted the information of the claim incorrectly initially which led to the denial of Ms. Wright's claims which was wilful actions.

256e. Sedgwick abused process through the use of an IME report to claim that the denial was not in bad-faith as an ulterior purpose to claim that the denial was justified to deter any additional liability. The basis under the IME was not based on medical evidence. The individual did not have all the medical evidence before him or if he did, he would have known that Ms. Wright complained to both doctors why she hurt her arm. The purpose of which was to ultimately for Ms. Wright to litigate her claims unjustifiably and file a claim with the Labor Division and was wilful as a result.

236f. There is no other explanation as to how Ms. Wright suffered an injury to her left shoulder. It is the same injury and complication to her right shoulder which she injured both from lifting wheel chalks. Ms. Wright had been lifting a 45 lb. wheel chalk a times a day. There is no explanation as to her bicep injury. Biceps are used rarely in heavy work-outs. However, with the Wheel Chalk, Ms. Wright had to do a bicep curl when lifting the chalk when she lifted it from her hips to above her hips.

236g. Sedgwick also unjustifiably denied the claim on Ms. Wright's right shoulder without a justifiable basis. This is in light of the fact that Ms. Wright was still suffering with complications to her right shoulder after she returned. This is in light of the fact that Ms. Wright's original injury to her right shoulder was deemed to be a work-site injury. This is in light of the fact that

the company would be liable for any future or additional complications to her right shoulder.

236h. The company instead denied the claim without a basis and forced Ms. Wright to file a claim with the Utah Labor Division.

236i. Both actions of which were wilful and had an ulterior motive. The actual purpose of the denials, was to litigate the matter of which Rio Tinto and Sedgwick entered into jointly to get Ms. Wright to agree to a "lump-sum" settlement. The actions of which were to mitigate any future unknown damages owed toward Ms. Wright that she may suffer complications from for the rest of her life. The company instead should have found that both injuries were work-site injuries and pay her her average weekly wage and medical expenses until she recovered. The company as threatened that if Ms. Wright did not settle the cases, that they would "drag-out" the case as a result. The company also was unwilling to settle the case unless Ms. Wright reached a "global resolution" on her worker's compensation claims and her claims filed in this complaint, the complaint of which was field almost two years after her worker's compensation claim and well after they wanted to resolve these unfiled claims. The company also claimed that they wanted to a lump sum for "medicaid and medicare purposes."

236j. The actions of which are ulterior motives and wilful to forcing Ms. Wright to litigate. The actions of which also, knowing that Ms. Wright was in a destitute state and unable to care for herself, was a means to coerce her to take a smaller settlement amount than what she was actually entitled attempting to settle the claims out of sheer desperation. The actions are also not regular conduct in a worker's compensation case as the only question is whether or not the injury is a work-site injury. If there was a work-site injury, then the company is liable for past and future average weekly wages and medical expenses. Forcing Ms. Wright to litigate the case

delayed her right to compensation of which the company knew she was entitled to and was a means to mitigate liability toward Ms. Wright. The purpose of worker's compensation is only if there is a good-faith defense.

236k. Rio Tinto also unjustifiably denied Ms. Wright her private insurance the month she was supposed to have surgery. The company of which knew that she had surgery scheduled for that month and of which she had waited over a year and a half to obtain. The action of which had an ulterior motive to further force Ms. Wright to settle her claims and keep her from obtaining the proper medical attention she needed for her injuries.

236l. The actions of which caused damage to Ms. Wright as to her ability to obtain the proper compensation for her injuries and attend to her personal needs and medical needs and delayed her ability to obtain surgery, it caused additional injury to her shoulders. It caused additional pain and suffering to her shoulders. It caused severe emotional distress. It also caused consequential damages described herein.

## BREACH OF FIDUCIARY DUTY

236m. Rio Tinto owed a duty as a fiduciary toward Ms. Wright as it related to filing a work-site injury on her behalf in a timely manner when she reported it after her injury to her left shoulder in July of 2016 lifting a wheel chock. The duty was breached when the company filed or never filed or reported a work-site injury in a timely manner that led to a denial of Ms. Wright's workers compensation claim. The failure to properly file the report made it so Ms. Wright could not bill her insurance company for her surgery and caused her to delay her surgery. The actions of which were also intentional as the company knew that Ms. Wright claimed that she tore her shoulder on the wheel chock. The company even had a meeting with Ms. Wright and the union

over the matter. They still thereafter failed to file a worksite injury. However, they later denied Ms. Wright FMLA leave with the claim that Ms. Wright had filed a workers compensation claim. 236n. Rio Tinto owed a duty as a fiduciary toward Ms. Wright as it related to filing her short-term disability paperwork on her behalf to the insurance company in a timely manner after her injury. The failure to file the paperwork in a timely manner forced Ms. Wright to be evicted from her home as she was unable to pay her bills and was unable to work due to her injury and caused a delay in her surgery and caused additional injury to both her shoulders as a result and emotional distress and was a breach of that duty as a result.

236o. Rio Tinto owed a duty as fiduciary toward Ms. Wright as it related to her 401k benefits and pulling funds for a hardship after her injury. The failure to allow her to access her benefits for a hardship also caused her to be evicted from her home and caused her to be unable to pay her bills and unable to work due to her injury and caused a delay in her surgery and caused additional injury to both her shoulders as a result and emotional distress and was a breach of that duty owed to Ms. Wright.

236p. Rio Tinto owed a duty as a fiduciary toward Ms. Wright as it related to her medical benefits. The duty was breached when the company cancelled Ms. Wright's medical benefits the month of her surgery in January of 2018. The company of which knew or should have known under company policy that an individual with a pending workers compensation claim could not have their medical benefits terminated. The breach of which caused Ms. Wright to have to delay her surgery for her right shoulder as she had to switch insurance and there was a portion of the surgery that the cancelled insurance would not cover neither medicaid insurance. The outstanding bill made it so Ms. Wright could not have the surgery when she needed it. It also

caused additional emotional distress and delay to Ms. Wright's recover.

236q. All of the duties described were of a position that placed Rio Tinto as Ms. Wright placed a trust and confidence and had an extraordinary relationship over Ms. Wright as it related to those duties as Ms. Wright was not able to file a work-place accident without the company to workers compensation, she was unable to access her 401k benefits without the permission of the company and the company was in charge of processing her short-term disability paperwork.

## VICARIOUS LIABILITY

236.    **The supervisors and employees of Rio Tinto described in this complaint were authorized to act on behalf of Rio Tinto** as it related to reporting work-site injuries, assignments and duties delegated to them including truck assignments, inspection of safety concerns as it relates to the trucks, inspection of the work site and safety as it relates to dangerous hazardous working conditions, time-off work, discipline, meetings with the Union and bonuses, as to Human Resources they were authorized to also report work-site injuries, approve time-off work, file for short-term disability, approve money withdrawal from a 401k, terminate medical benefits and properly file a work injury form. They also collectively had a duty to determine whether or not Ms. Wright needed federal medical clearance prior to suffering from an impaired limb as a CDL.

237.    They also collectively had a duty to accommodate Ms. Wright and her work restrictions and physical therapy and doctor appointments. The actions of which were described in this complaint were to benefit Rio Tinto under those duties at least in part as to managing individuals and their work-site injuries, disabilities, and work performance. This is also in light of the incentive from the company and the benefit and policy that deters individuals from reporting work-site injuries.

238.     Or, Ms. Wright and her actions with the individuals and interactions with the individuals as described in the complaint as to their titles and departments they worked in had a good-faith belief that they were acting with apparent authority on behalf of the company that would hold the company liable for the actions of its employees given the duties of Human Resources and Ms. Wright's supervisors as it relates to reporting injuries and company leave.

239.     The individuals were also agents acting on behalf of the company and their actions could have only occured with the authority that was bestowed on them from the company to act on the company's behalf given the superviseral nature toward Ms. Wright as an employee as as to her employee benefits and performance and safety as an employee and the actions of which could not been from an individual acting personally as a result.

240.     **The individuals that reviewed and denied Ms. Wright's workers compensation claims on both her shoulders with Sedgwick including the IME examiner,** also were acting with authority from the company to review and deny claims on their behalf and determine eligibility. Or the individuals that reviewed the claims for Ms. Wright were acting with apparent authority that they had the ability to make factual determinations as to her claims given the communications of Ms. Wright and the denial of her claims from the company itself. The actions of which were at least in part to benefit the company in determining and reviewing claims and eligibility for claimants. The individuals were also agents acting on behalf of the company and their actions could have only occured with the authority that was bestowed on them from the company to act on the company's behalf in that they could not in their individual capacity review and deny insurance claims on behalf of the company.

## DAMAGES

241.     Ms. Wright seeks actual damages for the actions described herein. She seeks actual damages for lost wages and benefits but-for the actions of the defendants is unlawfully and unjustifiably dragging out this action and benefits she should have obtained but for the actions in the amount of at least $108,126 at the time the complaint was filed in past wages and at least $980,882 in future lost wages and benefits.

242.     She seeks actual damages for the aggravated state the Defendants put Ms. Wright in as to both her shoulders and additional and unnecessary pain and suffering past and future she suffered and medical expenses past and future in the amount of at least $32,200 in past medical expenses and $96,600 in future medical expenses and $1,600,000.00 for her losses as to her aggravated condition which includes loss of enjoyment of life, wages and benefits, and her state but for the aggravated state past and future. Loss of enjoyment of life of which is calculated up to the average life expectancy of a female for the future minus the age of Ms. Wright and the loss being the yearly amount for each year for the loss. Lost wages and benefits calculated up to the average retirement age minus Ms. Wright's current age.

243.     She seeks actual damages for the injuries that Ms. Wright suffered as a result of the intentional or reckless actions of the company for failing to fix a broken haul-truck, placing Ms. Wright on lessor-qualified trucks, forcing her to continue to lift heavy wheel chalks and work before and after her injury which ultimately rendered her disabled and past and future medical expenses in the amount of $2,360,000.00 for her losses as to her condition which includes loss of enjoyment of life, wages and benefits, and her state but for the aggravated state past and future calculated as described in the above paragraph. *(Against Rio Tinto)*

244.    She seeks actual damages for the increased anxiety, stress, depression and other mental and emotional conditions conditions and issues described in this complaint as a result of the actions described in this complaint including therapy, medications and other medical related costs past and future in the amount of at least and loss of enjoyment of life in the amount of $820,000.00.

245.    Ms. Wright seeks actual damages for the consequential damages she suffered from, including the delayed surgery, her inability to bill her private insurance, not allowing her to take money from her 401k, the delayed payment for short-term disability, the loss of her home, the inability to make payments on her bills and trucks and medical bills. Reimbursement from disability payments she has received. She still owes payments on a truck in the amount of $26,000.00. Money past and future she has borrowed from friends and family and housing she has had to stay with friends and family in the amount of $65,000 for past at the time this complaint was filed. Her inability to provide for herself as a result of the unjustified delay in the amount of $120,000 to this date plus interest.

246.    Ms. Wright seeks damages for the pain and suffering she has suffered from from her mental medical condition and physical conditions at least four times the amount of actual damages the total amount being at least $21,658,432.00.

247.    Ms. Wright seeks punitive damages as a result of what she has gone through as to the intentional actions of Defendants as described in this complaint at least three times the amount of other damages the total amount being $64,976,296.00.

248.     Ms. Wright also seeks reimbursement of her attorney fees and costs as authorized under

statute as a prevailing party under his discrimination claims for disability, age and gender

pursuant to 42 U.S. Code § 12205.

249.     Ms. Wright also seeks incurred interest for the damages she has incurred.

250.     Ms. Wright also seeks for the company to pay any taxes that Ms. Wright would have to

pay for any damages and injuries that are paid in one-year that are from different years, causing

her to unnecessarily pay for any taxes but for the lost damages and incurred interest.

**WHEREFORE,** Ms. Wright respectfully prays that this court will grant the following relief in

light of what is described in this verified complaint:

1.     A factual and legal finding against the Defendant under the facts and law outlined in this

complaint.

2.     That a jury try be impaneled to make such a legal and factual determination at the time of

trial.

3.     For damages including interest as described in this complaint.

4.      Injunctive relief against Rio Tinto to have them cease and desist from actions and

policies that discriminate against individuals that suffer from work-site injuries and deter, harass

and bully individuals who attempt to report a work-site injury and incentives that promote such

unlawful activity.

5.     All other relief this court would deem proper in the administration of justice.


Respectfully submitted this 2nd day of April, 2019


/s/ Brian K. Jackson

_____

Brian K. Jackson
Brian K. Jackson, LLC
Attorney for Donna Wright